**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **UNITED STATES** | * | |
| | * | |
| | * | |
| **v.** | * | **Criminal No. 21-cr-00090-SAG** |
| | * | |
| **WAYNE I. KACHER, JR.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## <u>MEMORANDUM OPINION</u>

On May 21, 2024, a federal jury reached a unanimous verdict convicting Defendant Wayne I. Kacher, Jr. of conspiracy, five counts of honest services wire fraud, and six counts of federal program bribery. Mr. Kacher now moves this Court for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or for a new trial pursuant to Federal Rule of Criminal Procedure 33, primarily re-raising substantive arguments that this Court considered prior to and during the trial. ECF 197. The Government filed an opposition, ECF 201, and Mr. Kacher filed a reply, ECF 202. This Court has carefully considered the filings and has determined that no further hearing is necessary. For the reasons described below, Mr. Kacher's motion will be denied.

### I.  MOTION FOR JUDGMENT OF ACQUITTAL

Mr. Kacher argues that this Court should enter a judgment of acquittal pursuant to Fed. R. Crim. Proc. 29. Such entry is appropriate where the Court finds "the evidence is so insufficient that no rational trier of fact could convict," after viewing the evidence and inferences to be drawn therefrom in the light most favorable to the government. *United States v. Rafiekian,* 68 F.4th 177, 186 (4th Cir. 2023) (emphasis omitted). In other words, judgment of acquittal is appropriate "when the evidence is so deficient that acquittal is 'the *only* proper verdict.'" *Id.* (quoting *Tibbs v. Florida,*

457 U.S. 31, 42 (1982)). Under that high bar, this Court does not find entry of judgment of acquittal to be warranted.

In lieu of attempting a comprehensive factual summary of the eight-day jury trial, this Court will address Mr. Kacher's contentions and will interweave discussion of the relevant facts into its analysis. Essentially, however, as reflected in its verdict, the jury determined that Mr. Kacher paid kickbacks or bribes to his co-defendant, William Patrick Mitchell, who served as the President and Chief Executive Officer of the Maryland Broadband Cooperative, Inc. ("MdBC"). ECF 191 at 15. MdBC is a nonprofit, cooperative organization, composed of public and private entities, with the aim of offering broadband internet service to underserved and unserved areas in Maryland. *Id.* at 16–18. MdBC had entered a cooperative agreement with the United States Navy to install broadband infrastructure on the Eastern Shore of Maryland, specifically connecting a NASA facility on the Eastern Shore of Virginia to the Patuxent River Naval Air Station ("Pax River") in St. Mary's County, Maryland. *Id.* at 19. The contract between the Navy and MdBC, the "Broadband Agreement," outlined the terms for the "Pax River Project." *Id.* at 20. The Broadband Agreement explained that the Navy and MdBC had overlapping goals that would be served by the Pax River Project. *Id.* at 21. The Navy wanted to enhance communications between its two facilities, and MdBC and its members wanted to use the new broadband infrastructure to provide broadband internet access to additional customers on the Eastern Shore. *Id.* at 21–23. While MdBC hired the contractors to perform the work on the project, the two entities shared the costs. *Id.* at 25. The Navy ultimately paid MdBC more than twenty-four million dollars under the Broadband Agreement, including more than $10,000 in payments each calendar year from 2014 to 2018. *Id.*

Mr. Kacher is President and owner of Bel Air Underground, Inc. ("BAU"), an underground utility contractor in Maryland. *Id.* at 97. He is also part-owner of Pro Comm Engineering and

Locating Services, LLC ("Pro Comm"), an underground utility locating company. ECF 192 at 92–93. MdBC used BAU and Pro Comm as subcontractors on the Pax River Project and other projects. Essentially, the charges in this case arise out of payments that Mr. Kacher made to and on behalf of Mr. Mitchell in 2016 and 2017. The Government alleges, and the jury found, that Mr. Kacher and Mr. Mitchell conspired to make those payments, which constituted bribes and kickbacks, and that the payments were intended to deprive MdBC of the honest services of its official, Mr. Mitchell. The government alleges, and the jury found, that Mr. Kacher intended the payments to influence a number of official acts Mr. Mitchell took.

### A.  Quid Pro Quo

In his motion, Mr. Kacher's first argument is that the Government failed to prove a "quo" in support of its argument that "quid pro quo" bribe/kickback transactions took place between Mr. Kacher and Mr. Mitchell. This Court disagrees and finds that the trial evidence would permit a rational juror to find, beyond a reasonable doubt, both sides of a "quid pro quo" with respect to the transactions at issue.

As during the trial, Mr. Kacher's argument focuses on the timing of the alleged bribe/kickback payments as compared with the various subcontracts between MdBC and BAU. According to Mr. Kacher, because the subcontracts were executed and agreed before the bribe payments occurred in this case, there can be no quid pro quo because a bribe has to involve a payment for a future act.

But as this Court ruled when considering the jury instructions in this case, the act relevant to the bribe or kickback can happen before the bribe payment is made, so long as the parties agreed in advance that such bribe or kickback payments would take place in exchange for the act. As the Fourth Circuit has explained, "[b]ribes often are paid before the fact, but 'it is only logical that in

certain situations the bribe will not actually be conveyed until the act is done.'" *United States v. Jennings,* 160 F.3d 1006, 1014 (4th Cir. 1998) (quoting *United States v. Campbell*, 684 F.2d 141, 148 (D.C. Cir. 1982)).

In other words, in some circumstances, parties agree to a "future bribe" or "future kickback." The evidence in this case, viewed in the light most favorable to the Government, suggests exactly that type of arrangement between Mr. Mitchell and Mr. Kacher. Of course, since neither Mr. Mitchell nor Mr. Kacher testified at trial, the Government offered no direct evidence of their agreed terms. But the jury's verdict is not based on speculation or surmise. The Government introduced compelling circumstantial evidence that the men had reached an agreement that Mr. Kacher would pay kickbacks to Mr. Mitchell following payment of significant sums from MdBC to Mr. Kacher's companies. At least five examples of such evidence are summarized below.

First, part of the evidence related to the conspiracy (though not included as substantive counts because of limitations issues) occurred in 2014. On August 1 of that year, MdBC paid a total of $250,000 to BAU for its work on the Pax River Project. ECF 201-4, 201-5. That same day, Mr. Kacher wrote a check from BAU's account, payable to cash, and used it to purchase a cashier's check in the amount of $25,000 that he signed over to Mr. Mitchell. ECF 201-6, 201-7 The records further reflect two additional $25,000 payments in the fall of 2014 from Mr. Kacher to Mr. Mitchell, made in the same circuitous manner. ECF 201-9, 201-10, 201-11, 201-15, 201-16, 201-17, 201-18. The fall of 2014 marked the award of a major subcontract on the Pax River project. ECF 201-49, 201-52.

Second, the Government proceeded under a "stream of benefits" theory, which does not require matching up a specific kickback payment to a specific invoice payment or official act. *See*

18 U.S.C. § 666 (using the phrase "series of transactions" as one of the prohibited objects of a bribe); *United States v. Jefferson,* 674 F.3d 332, 359 (4th Cir. 2012) ("[B]ribery can be accomplished through an ongoing course of conduct.") (citation omitted). Here, while it did not link particular kickbacks to individual invoices, the Government proved that the amount and frequency of payments from Mr. Kacher to Mr. Mitchell waxed and waned in alignment with official acts, including BAU's payments from MdBC. For example, the sequence of $25,000 payments described above occurred in 2014, when the Pax River subcontract was awarded. In 2015, there is less evidence of payments from Mr. Kacher to Mr. Mitchell, and also less substantial business between MdBC and BAU. In 2016 and 2017, however, Mr. Kacher received more than $1.6 million in non-Pax River business, in addition to significant payments in connection with Pax River work. Correspondingly, the pace of Mr. Kacher's payments on behalf of Mr. Mitchell increased. In October, 2016, Mr. Kacher (BAU) made payment in the amount of $21,721.80 for construction of a pole barn at Mr. Mitchell's home. ECF 201-22. In November, 2016, Mr. Kacher made another series of payments including $3,000 for cabinets at Mr. Mitchell's residence, $6,800 for flooring at Mr. Mitchell's residence, $10,972.61 for an all-terrain vehicle for Mr. Mitchell, and another payment of $14,697.20 for the remaining balance on the pole barn. ECF 201-23, 201-24, 201-25. November 2016 was also BAU's second-highest grossing month ever in terms of its revenue from MdBC. ECF 192 at 180–81.

Third, in April 2017, MdBC paid BAU $497,000 and also loaned BAU $135,000. ECF 192 at 206–07. Days later, on April 24, 2017, BAU issued a check to John Deere Financial for $15,215.74. ECF 193 at 11. That check was never negotiated by John Deere. *Id.* at 12. On May 25, 2017, Mr. Mitchell texted Mr. Kacher, asking "any update on John Deere? I'm three months behind and not sure how this is affecting my credit." *Id.* at 11, 62. In other words, there had been

an agreement Mr. Kacher would pay John Deere and because he had not paid, Mr. Mitchell fell

behind. Mr. Kacher then responded that his assistant, Val, was on the phone with John Deere and

then that he paid off the loan by wiring $15,215.75. *Id.* at 63, 64. This series of texts shows a

prearranged transaction, not a goodwill gift.

Fourth, Mr. Kacher and Mr. Mitchell engaged in other communications reflecting that the

payments Mr. Kacher made to Mr. Mitchell were part of a regular, arranged circumstance. They

repeatedly referred to payments as a "double" or a "reg," suggesting that there were prearranged

regular payment amounts that could be doubled. *See, e.g., Id.* at 59 (Mr. Kacher texting Mr.

Mitchell, "Can prob double you up before you roll"); *Id.* at 61 (Mr. Mitchell texting Mr. Kacher,

"[r]eg or double, trying to forecast."); *Id.* at 65 (Mr. Kacher texting Mr. Mitchell, "Headed your

way, double."); *Id.* at 66 ("Mr. Kacher texting Mr. Mitchell, "I'll bring you the postdated check

for the 10k and a double for now"). Goodwill gifts do not have fixed amounts.

Fifth, the Government introduced evidence that Mr. Kacher and Mr. Mitchell covered up

these transactions, or the reasons for them, with the financial officers at their respective companies.

For example, Mr. Kacher paid for Mr. Mitchell's home renovations and all-terrain vehicle in 2016

were paid out of an BAU account at First National Bank that he concealed from BAU's Chief

financial officer and tax preparer, Kyle Richards. ECF 191 at 129–30; ECF 201-59. Mr. Kacher

lied to Mr. Richards and told him the payment came from a personal account, which caused Mr.

Richards to file false tax returns for BAU. ECF 191 at 130–34.

The Government also offered additional evidence to refute Mr. Kacher's alternative theory:

that these significant payments were simply generous "goodwill gifts" from Mr. Kacher to his

friend to show appreciation for their relationship, specifically (1) Mr. Mitchell's assistance in

helping ProComm land a multi-year contract with Crown Castle and (2) Mr. Mitchell allowing

Mr. Kacher to stay at his home during a job BAU performed for Whiting-Turner. The evidence of Mr. Kacher and his companies' ongoing financial woes, in combination with evidence that Mr. Kacher did not behave generously with others in his circle, undermine the notion that Mr. Kacher or BAU would have given such sizeable voluntary gifts to Mr. Mitchell. *See, e.g.*, ECF 191 at 136 (Kyle Richards discussing BAU's issues making payroll and paying rent); ECF 192 at 112–14 (former BAU employee Kenneth Albers discussing loans he and his spouse made to BAU); ECF 201-30 (text from Mr. Kacher confirming $230k in federal taxes owed); ECF 195 at 129 (testimony from BAU employee Val Argentino that BAU's water had been shut off for nonpayment "once, maybe twice"). Paying for home renovations or a utility vehicle is not equivalent to a nice dinner or even an expensive bottle of wine. The jury reasonably rejected the notion that Mr. Kacher voluntarily, out of goodwill or gratefulness, made these extremely significant expenditures that were well outside his means.

Finally, the Government introduced evidence in the form of Mr. Kacher's statement to FBI Special Agent Keith Custer. Mr. Kacher told SA Custer that, "[H]e definitely felt 100 percent pressured to comply whenever Mr. Mitchell asked for money" and he was concerned if he did not give money, he would be "losing the entirety of his business with" MdBC. ECF 191 at 169–70. Such an arrangement, with work premised on the payment of agreement to pay kickbacks, would not constitute a voluntary "goodwill gift." It would be consistent with the "stream of benefits" kickback theory espoused by the Government.

This evidence suggesting the existence of an agreement between Mr. Kacher and Mr. Mitchell to pay kickbacks upon receipt of large invoice payments from MdBC satisfies the requirements the Fourth Circuit has described. In the recent case of *United States v. McCabe,* 103 F.4th 259 (4th Cir. 2024), the Fourth Circuit explained, "The requirement is that the 'particular

question or matter' concerning the official act has been 'identified at the time the official makes a promise or accepts a payment.'" *Id.* at 284. Mr. Kacher did not make the 2016–17 payments just for a "vague expectation of future benefit," although the evidence suggests he did believe that a failure to make the payments would impede his ability to get future work from Mr. Mitchell. Instead, the evidence suggests he made the payments to fulfill an ongoing kickback agreement the two had reached.

Mr. Kacher's contention that the Government failed to show that the invoices he submitted were inflated is unavailing. Of course, it is common in some kickback cases that the payor of the kickback might inflate an invoice so that the kickback does not come out of his own pocket. But there is no requirement that a kickback payor engage in that practice. A kickback can be paid whether an invoice is inflated or not.[1]

Finally, the awarding of the Pax River subcontract (or other contracts) did not constitute Mr. Mitchell's only "official act" in this case. The Government introduced evidence that Mr. Mitchell also exercised his official authority at MdBC to approve loan payments to Mr. Kacher, to direct more expeditious payment of Mr. Kacher's corporate invoices outside of the normal course of payment for MdBC, and to provide a truck, paid for by MdBC, to Mr. Kacher for use by his son. The Government's evidence of these acts, and efforts by Mr. Mitchell and Mr. Kacher to conceal them, also supported the jury's verdict on the "stream of benefits" theory. Ultimately, this is a case in which, when the evidence is viewed in the light most favorable to the Government, ample evidence supports the jury's verdict.

---

[1] Mr. Kacher's argument on this point rests on all of the invoiced amounts being "within the bids" ECF 197 at 5. Of course, this logic does not foreclose the bids having been inflated at the outset to account for an anticipated kickback. The issue is immaterial, however, because an inflated invoice is not a required element of the offense.

B.      **Whether MdBC received a federal benefit exceeding $10,000**

Mr. Kacher also re-raises in this motion an argument that this Court rejected twice during the trial. ECF 193 at 92–103; ECF 195 at 182–185. 18 U.S.C. § 666, the statute prohibiting theft or bribery concerning programs receiving federal funds, requires that the recipient entity have received a "benefit" of more than $10,000 from the federal government within one year. Mr. Kacher contends that the government funds disbursed to MdBC for the Pax River project were simply compensation or reimbursement and not a qualifying "benefit" to MdBC as required by the law. ECF 197 at 26-31.

Both parties recognize that the "benefit" standard was elucidated by the Fourth Circuit in *United States v. Pinson,* 860 F.3d 152, 166–67 (4th Cir. 2017):

> The key question is whether the funds are paid to the entity for significant and substantial reasons in addition to compensation or reimbursement. To make this determination, courts should examine the recipient entity's structure, operation, and purpose as well as conditions under which the organization receives the federal payments. Entities receive a benefit for purpose of § 666 when they are the subject of substantial Government regulation that helps them achieve long-term objectives or policy goals beyond performance of an immediate transaction. In contrast, if the payment is made simply to reimburse, then the recipient entity isn't receiving a benefit.

*Id.* (internal quotations and citations omitted).

The facts in *Pinson* illustrate why MdBC received a benefit in the instant case, not simply reimbursement for an immediate transaction. In *Pinson,* the federal government gave a grant to a housing authority to further its goals of promoting affordable housing. *Id.* at 166. The Fourth Circuit recognized that, "The Housing Authority certainly received a benefit when the federal government awarded it a grant to promote affordable housing." *Id.* 167. In that case, however, money was not stolen from the Housing Authority and no bribes were paid to any official of that entity. Instead, the issue in the case pertained to the theft of payments that the Housing Authority

9

had made to an owner/developer, Village at River's Edge ("VRE"), "for the construction of 60 housing units." VRE, in turn, hired a builder to build the units on its property. *Id.* One of the managers of VRE failed to pay all of the funds VRE received from the Housing Authority to the builder, instead embezzling the funds for his personal use. *Id.* at 170. The Fourth Circuit determined that VRE had not received a "benefit" from the federal money, because the payments from the Housing Authority to VRE had simply been to reimburse the cost of construction, not to further some greater goal of VRE. *See id.* at 167 ("Viewed in the light most favorable to the government, the evidence failed to show that the federal money given to VRE by [Housing Authority] was for 'significant and substantial reasons in addition to compensation or reimbursement.'"). And because the theft was from VRE, which had not received a qualifying $10,000 benefit, the Fourth Circuit overturned the defendant's conviction for federal program theft. *Id.* at 172.

Comparing the facts of *Pinson* to the instant case, MdBC sits in the position of the Housing Authority, not VRE. The Navy paid the money to MdBC, who then paid it to the contractors, BAU or ProComm, who performed the actual work on the project. The person alleged to have been bribed is Mr. Mitchell, an agent of MdBC, not an agent of the contractor companies. And MdBC, like the Housing Authority in *Pinson*, did receive a benefit from the federal government. The trial evidence proved that MdBC derived substantial benefit from its contract with the Navy, furthering its long-term goals of extending broadband internet service to rural communities. Running broadband cable to and through the Eastern Shore allowed MdBC and its members to extend service in those rural areas of the State. Because the payments providing MdBC that benefit exceeded $10,000 each year, the Government proved beyond a reasonable doubt that MdBC received the requisite benefit for purposes of § 666.

## II.      RULE 33 MOTION FOR NEW TRIAL

Finally, Mr. Kacher argues that even if this Court deems entry of judgment of acquittal inappropriate, this Court should grant a new trial pursuant to Fed. R. Crim. Proc. 33. The Rule 33 analysis does not require this Court to view all of the evidence in the light most favorable to the Government. Instead, the district court, "sit[ting] as a thirteenth juror, conducts its own assessment of the evidence, unconstrained by any requirement to construe the evidence in the government's favor." *Rafiekian*, 68 F.4th at 188 (internal quotation marks and citations omitted). However, mere disagreement or a hunch that the case should go the other way does not suffice. Instead, a new trial is warranted only "[w]hen the evidence weights so heavily against the verdict that it would be unjust to enter judgment." *United States v. Arrington*, 757 F.2d 1484. 1485 (4th Cir. 1985). That standard is "demanding." *Rafiekian,* 68 F.4th at 187 (citing *United States v. Millender*, 970 F.3d 523, 532 (4th Cir. 2020)).

While a Court may properly re-weigh the evidence and determine that a new trial is warranted based on the cumulative weight of the evidence, this case does not present that circumstance. Instead, this case presents a quintessential jury question regarding intent, and evidence was introduced in support of both sides' positions. Both attorneys argued the appropriate inferences to be drawn from the evidence presented. Considering all of that evidence, this Court believes that the jury reached supportable inferences that Mr. Kacher's payments constituted kickbacks, not goodwill gifts or payments "made out of gratitude." Certainly, this Court cannot say that the "evidence weights so heavily against the verdict that it would be unjust" to enter judgment and proceed to sentencing. Accordingly, this Court does not disagree with the jury's assessment of the evidence and declines to grant a new trial.

### III.     CONCLUSION

For the reasons stated above, this Court DENIES Mr. Kacher's motion for judgment of acquittal or a new trial. Chambers will contact the parties to set a sentencing date.

Dated: September 3, 2024                                          _____/s/_____
                                                                                  Stephanie A. Gallagher
                                                                                  United States District Judge